Filing # 230344469 E-Filed 08/27/2025 12:59:30 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

J.B.

      PLAINTIFF,           CASE NO.: CACE-25-012933

v.

WEST PALM HOTELS LLC, a
Delaware limited liability company

         DEFENDANT.

_____

## CORPORATE SUMMONS

**THE STATE OF FLORIDA**

To Each Sheriff of the State:

**YOU ARE COMMANDED** to serve this Summons and a copy of the Complaint in this action on Defendant by serving its Registered Agent:

**WEST PALM HOTELS LLC
c/o C T CORPORATION SYSTEM
1200 SOUTH PINE ISLAND ROAD
PLANTATION, FL 33324**

Defendant is required to serve written defenses to the Complaint on Plaintiff's attorney, Anthony Chiarello Esq., whose address is:

**VICTIM'S VOICE, LLC
100 N. FEDERAL HWY, 4th FLOOR
FORT LAUDERDALE, FL 33301**

within twenty (20) days after service of this Summons on Defendant, exclusive of the day of service, and to file the original of the defenses with the Clerk of this Court either before service on Plaintiff's attorney or immediately thereafter. If Defendant fails to do so, a default will be entered against Defendant for the relief demanded in the Complaint.

      WITNESS my hand and the Seal of this Court, this_____    AUG 28 2025

                          BRENDA D. FORMAN
                          Clerk of the Courts

                          By:_____
                          As Deputy Clerk



BRENDA D. FORMAN

## • VICTIM'S VOICE, LLC •

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 • Phone: 754-335-4700**

1

EXHIBIT B

## IMPORTANT

A lawsuit has been filed against you. You have 20 calendar days after this summons is served on you to file a written response to the attached Complaint with this Court. A phone call will not protect you; your written response, including the above case number and named parties, must be filed if you want the Court to hear your case. If you do not file your response on time, you may lose the case, and your wages, money, and property may thereafter be taken without further warning from the Court. There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may call an attorney referral service or a legal aid office (listed in the phone book).

If you choose to file a written response yourself, at the same time you file your written response to the Court you must also mail or take a carbon copy or photocopy of your written response to the Plaintiff's Attorney named above.

## IMPORTANTE

Usted ha sido demando legalmente. Tiene veinte (20) dias, constados a partir del recibo de esta notificacion, para contestar la demanda adjunta, por escrito, y presentaria ante este tribunal. Una llamada telefonica no lo protegera; si usted desea que el tribunal considera su defensa debe presentar su respuesta por escrito, incluyendo el numero del caso y los nombres de las partes interesada en dicho caso. Si usted no contesta la demanda a tiempo, pudies perder el caso y podria ser despojado de sus ingresos y propiedades, or privado de sus deredchos, sin previo aviso del tribunal. Existen otros requisitos legales. Si lo desea, puede usted consultar a un abogado immediatements. Si no conoce a un abogado puede llamar a una de las oficinas de asistencia legal que aparecen en la quia telefonica.

Si desea responder a la demanda por su cuenta, al mismo tiempo en que presenta su respuesta ante el tribunal, debera usted enviar por correo o entregar una copia de su respuesta a la persona denominada abajo como "Plaintiff/Plaintiff's Attorney." (Demandate o Abogado del Demandante).

## IMPORTANT

Des poursuites judiciaries ont ete entreprises contre vous. Vous avez 20 jours consecutifs a partir de la date de l'assignation de cet'te citation pour deposer une reponse ecrite a la plainte ci-jointe aupres de ce Tribunal. Un simple coup de telephone est insuffisant pour vous proteger; vous etes oblige de deposer votre reponse ecrite avec mention du numero de dossier ci-dessus et du nom des parties nomees ici, si vous souhaitez que le Tribunal entende votre cause. Si vous ne deposez pas votre reponse ecrite dans le relai requis, vous risquez de perdre la cause ainsi que votre salaire, votre argent, et vos biens peuvent etre saisis par la suite, sans aucun preavis ulterieur du Tribunal. Il y a d'autres obligations juridiques et vous pouvez requerir les services immediats d'un avocat. Si vous ne connaissez pas d'avocats, vous pourriez telephoner a un service de reference d'avocats ou a un bureau d'assistance juridique (figurant a l'annuaire de telephones).

Si vous choisissez do deposer vous-meme une reponse ecrite, il vous faudra egalement, en meme temps que cette formalite, faire parvenir ou expedier une copie au corone ou une photocopie de votre reponse ecrite au "Plaintiff/Plaintiff's Attorney" (Plaignant ou a son avocat) nomme ci-dessous.

## ▪ VICTIM'S VOICE, LLC ▪

**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 • Phone: 754-335-4700**

Filing # 230277835 E-Filed 08/26/2025 04:22:51 PM

IN THE CIRCUIT COURT OF THE 17TH
JUDICIAL CIRCUIT IN AND FOR
BROWARD COUNTY, FLORIDA

J.B.

     Plaintiff,                  CASE NO.: _____

v.

WEST PALM HOTELS LLC, a
Delaware limited liability company

     Defendant.

_____/

## COMPLAINT AND DEMAND FOR JURY TRIAL

    Plaintiff, J.B., by and through undersigned counsel, hereby files her Complaint against

Defendant, WEST PALM HOTELS LLC d/b/a Super 8, and as grounds therefore states as follows:

### INTRODUCTION

1. This is an action for damages in excess of Fifty Thousand Dollars ($50,000.00).

2. This action for damages is brought by the Plaintiff, J.B., a survivor of sex trafficking, under
   the federal William Wilberforce Trafficking Victims Protection Reauthorization Act of
   2008 (hereinafter the "TVPRA") and Florida state law.

3. J.B. files this civil lawsuit seeking compensation for the harm she suffered when she was
   forcibly sex-trafficked at the Super 8 owned, operated, maintained, and controlled by
   WEST PALM HOTELS LLC its owner, manager, employees and agents.

4. Defendant, WEST PALM HOTELS LLC, (collectively with its managers, employees and
   agents who, for the remainder of this complaint, always acted the course and scope of their
   employment and for the benefit of the Super 8, shall be referred to as the "Harboring

### ▪ VICTIM'S VOICE, LLC ▪
**100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

1

Defendant") has owned and managed the Super 8, franchised by Wyndham Hotels & Resorts, located at 1255 Hypoluxo Rd, Lantana, FL 33462, at all relevant times, since 2016.

5. The Harboring Defendant, through its owners, operators, managers, supervisors and employees controlled, operated and was responsible for the Super 8 described above where Plaintiff, J.B., was trafficked.

6. As described below, J.B. was forcibly sex trafficked as a direct result of a joint business venture between Plaintiff's sex trafficker and the Harboring Defendant who purposely and knowingly cooperated with and participated in this sex trafficking enterprise. J.B.'s trafficker purposely chose the Super 8 to sex traffic J.B. because he knew his commercial sex trafficking enterprise would be facilitated by the cooperation of the Harboring Defendant, and by his prior relationship with the Harboring Defendant at the Super 8.

7. For approximately 4 years, from 2020 through 2024, J.B., just a 16-year-old girl, was repeatedly trafficked for sex at the Super 8 by Michael Knight (2020-2021), "Devonte" (2021) and Travarez Bolton ("Swipe") (2022-2024) (collectively "Traffickers").

### SEX TRAFFICKING IN THE TVPRA

8. According to the TVPRA "[a]t least 700,000 persons annually, primarily women and children, are trafficked within or across international borders. Approximately 50,000 women and children are trafficked into the United States each year."

9. The stated purpose of the TVPRA is "to combat trafficking in persons, a contemporary manifestation of slavery whose victims are predominantly women and children, to ensure just and effective punishment of traffickers, and to protect their victims."

10. Sex trafficking is defined in the TVPRA under 22 U.S.C. § 7102, as "the recruitment,

**▪ VICTIM'S VOICE, LLC ▪**
100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purposes of a commercial sex act and in which the commercial sex act is induced by force, fraud, or coercion or in which the person induced to perform such act has not attained 18 years of age."

11. Recognizing that criminal penalties for pimps and sex buyers were insufficient, Congress passed Section 1591 of the TVPRA which provides a civil remedy against everyone "involved" in the sex trafficking enterprise, specifically including hotels like the Super 8 that harbored J.B. for sex trafficking purposes.

12. Under the TVPRA, every entity who knowingly harbors another for a commercial sex act that was provided through force, fraud, and coercion or from any person, or merely induced to provide same from a person under the age of 18 years old, are guilty of sex trafficking; again, this includes the Super 8 and other hotels like it.

13. Further, any person who knowingly benefits from a commercial sex trafficking enterprise based on forced sex trafficking is jointly and severally liable for the damages arising from said trafficking.

14. J.B. was one of the 50,000+ victims of this form of sex slavery and a victim of sex trafficking within the meaning of the TVPRA.

15. The Harboring Defendant's cooperation with J.B.'s Traffickers, as described herein, constitutes a violation of the TVPRA, and J.B. would not have been trafficked without the acts and omissions of Harboring Defendant.

16. J.B. brings this civil action under 18 U.S.C. §1595 seeking recovery for a year of forced sex slavery at the Super 8, with the cooperation and participation of the Harboring

Defendant.

## **SUPER 8 VIOLATED THE TVPRA**

17. Forced sex trafficking of people like J.B. is prevalent throughout the United States because hotels like Super 8 provide a non-traceable, low-overhead, low-risk commercial enterprise for sex traffickers.

18. Hotels like Super 8 also provide easy access, anonymity, privacy, and discretion for buyers and, with a hotel's participation, such an enterprise can remain hidden from law enforcement.

19. The TVPRA put Super 8 on notice of the high likelihood of sex trafficking occurring on their hotel premises.

20. Furthermore, the Wyndham Hotels & Resorts (the franchisor of the Super 8) is a signatory to the Child Protection Code of Conduct ("The Code") established in 2004 (https://thecode.my.salesforce-sites.com/apex/LCRProfile1?country=USA), so it explicitly adhered to a set of codes that put it on notice of J.B.'s sex trafficking; sadly, had it complied with The Code, J.B. would never have been harbored at their hotel.

21. Upon information and belief, the Super 8 had policies and procedures designed to identify and report the obvious signs of sex trafficking, so the Harboring Defendant was well-aware of the violence, manipulation, lies, debt bondage, physical restraint, drugs, and coercion used to force J.B. into sex trafficking.

22. Based on its own sex-trafficking policies and a combination of well-documented indicators, the Harboring Defendant knew or should have known that J.B. was being sex trafficked at its hotel, but it chose to ignore these indicators and eschew its own policies;

rather, the Harboring Defendant cooperated with J.B.'s Traffickers to traffic J.B. for profit.

23. At all material times, the Harboring Defendant, individually and collectively through its agents, employees, and franchisees, aided, abetted, concealed, confined, benefitted, harbored and profited from J.B.'s sex trafficking at its hotel through a venture with Plaintiff's Traffickers, which caused J.B. foreseeable and catastrophic damages.

### SEX TRAFFICKING VENTURE UNDER THE TVPRA

24. A sex trafficking venture under the TVPRA is the participation in a common sex trafficking enterprise that involves risk and potential profit. (*Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 725 (11th Cir. 2021))

25. The Harboring Defendant participated in a common sex trafficking venture with J.B.'s Traffickers where, together, they minimized their risks and maximized their profits.

26. The Harboring Defendant maximized profits from increased room occupancy, increased franchise royalty fees, increased property value, on-site food and beverage and condom sales, ATM fees, bribes, kickbacks, tips, drugs, sexual favors and other remuneration brought in by J.B.'s Traffickers and the "Johns" that visited the hotel; simply put, participation with J.B.'s Traffickers helped keep the hotel full.

27. In return, Harboring Defendant created an environment where J.B. could be sex trafficked out of the public view and away from prying eyes of law enforcement; this environment was specifically designed to chill any actions that might interfere with the trafficking of (people like) J.B. at its hotel.

28. Harboring Defendant purposely chose not to implement its own sex trafficking policies, educational or training programs, and it purposely chose not to implement policies (or it

chose to violate the policies it did have) that would have identified, reported, documented, investigated, prevented or ended the sex trafficking at the hotel; this is especially egregious as its policies were designed to prevent sex trafficking and provide safe lodging.

29. Harboring Defendant willfully created an environment where a sex-trafficking venture could flourish, it did flourish, it knew it flourished, and, as a result, J.B. was trafficked at the Super 8.

30. Furthermore, Harboring Defendant's participation in this sex-trafficking enterprise was, as previously stated, through the acts of their owners, employees, and agents acting within the scope and course of their employment for the benefit of the Harboring Defendant.

31. As a direct and proximate result of the Harboring Defendant's cooperation, willful blindness, negligence, facilitation, malfeasance, and consistent refusals to adhere to common sense policies that would have eliminated human trafficking at Super 8, 16-year old J.B. was drugged, starved, beaten, sold, assaulted, abused, and repeatedly raped, in a joint venture between her sex Traffickers and the Harboring Defendant at Super 8, in violation of the TVPRA.

## JURISDICTION AND VENUE

32. This Honorable Court has jurisdiction and venue over this matter because Defendant is a foreign corporation with agents and other representatives doing business in Broward County, Florida.

## PARTIES

### I.   Plaintiff J.B.

33. Plaintiff, J.B. is a Florida resident and is otherwise *sui juris*. She may be contacted through her lead counsel, whose information is contained below.

34. J.B. is a victim of sex trafficking under the TVPRA because she was harbored, transported, or provided and forced to commit commercial sex acts at the Super 8 located at 1255 Hypoluxo Rd, Lantana, FL 33462 from 2020 until 2024.

35. Given the nature of the case, J.B. is identified in this Complaint by a fictitious name to prevent public disclosure. Plaintiff's counsel has either previously disclosed full names to defense counsel or will do so immediately upon identification of defense counsel.

36. When filing this Complaint, Plaintiff's counsel also filed a Motion for Protective Order seeking Court permission for Plaintiff to proceed anonymously.

### II.   West Palm Hotels LLC

37. West Palm Hotels LLC owned the "Super 8" hotel and is a Delaware limited liability company and based upon information and belief, at all relevant times, was authorized and licensed to do, and is doing business at its principal place of business in Palm Beach County, in the State of Florida, offering the Super 8 as a harboring hotel as a place of public lodging; it has owned the hotel since 2016.

38. All references to the Harboring Defendant include any and all departments, divisions, offices, agencies, subsidiaries, or corporate affiliates, whether domestic, foreign, and/or international. These references also include any and all directors, officers, agents (either with direct/actual or implied/apparent authority), employees, persons, firms, or franchisors,

who have taken any action or committed any omission on behalf of the Harboring Defendant now or at any time relevant to the claims herein.

39. Any and all references to the actions or omissions of the Harboring Defendant (either with direct/actual or implied/apparent authority) are specifically alleged to have been taken or omitted in the course and scope of said person's employment or agency and for the benefit of the Defendant, and were the kind of services they were employed to perform; their services were provided substantially within both the time and space limits of their employment; and they were motivated, at least in part, by a purpose to serve and benefit their employer, West Palm Hotels LLC.

40. Based upon information and belief, at all relevant times, Super 8 is a motel branded by Wyndham Hotels & Resorts and has been owned and/or operated by or through Wyndham Hotels & Resorts, since at least 2016.

41. Harboring Defendant, directly participated in a commercial venture that included the harboring and forced trafficking of J.B., therefore becoming a perpetrator of her sexual trafficking under the TVPRA.

42. Harboring Defendant knowingly benefitted from this sexual trafficking enterprise in which it knew or should have known that Plaintiff was being sexually trafficked against her will.

## BACKGROUND AND FACTS

### Super 8 had Knowledge of J.B.'s Sex Trafficking

43. The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Harboring Defendant knew or should have known

regarding the forced sex-trafficking of J.B. at the harboring hotel.

44. Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[1] This is no accident. For years, sex traffickers have been able to reap enormous profits with "little risk when attempting to operate within hotels."[2] In 2014, 92 percent of calls to the Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[3] Hotels have been found to account for over 90 percent of commercial sexual exploitation of children.[4]

45. Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including the Super 8, on best practices for identifying and responding to forced sex trafficking.[5]

---

[1] "This is not only a dominant issue, it's an epidemic issue." See Jaclyn Galucci, Human Trafficking is an Epidemic in the U.S. It's Also Big Business, Fortune, April 2019, at https://fortune.com/2019/04/14/human-sex-trafficking- usslavery/ citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council. "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." Id.

[2] See Human Trafficking in the Hotel Industry, Polaris Project, February 10, 2016, at https://polarisproject.org/blog/2016/02/human-trafficking-in-the-hotel-industry/.

[3] Michele Sarkisian, Adopting the Code: Human Trafficking and the Hospitality Industry, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015), available at: https://humantraffickingsearch.org/wp-content/uploads/2019/05/Adoptingthecode.report.cornell.pdf

[4] Erika R. George & Scarlet R. Smith, In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking in Modern Slavery, 46 N.Y.U. J. INT'L L. & POL. 55, 92 (2013).

[5] See, e.g., Department of Homeland Security, Blue Campaign Toolkit, available at: https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf; National Center for Missing & Exploited Children, Child Sex Trafficking Overview, available at: https://www.missingkids.org/content/dam/missingkids/pdfs/CST%20Identification%20Resource.pdf; Love 146, red Flags for Hotel and Motel Employees, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and- Reporting-Love146.pdf; Texas Attorney

---

46. Widely recognized signs of forced sex trafficking, which can be observed by hotel staff and which the Harboring Defendant were aware of, include but are not limited to:

   a. Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

   b. Individuals show signs of physical abuse, restraint, and/or confinement;

   c. Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

   d. Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

   e. Individuals lack freedom of movement or are constantly monitored;

   f. Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

   g. Individuals have few or no personal items—such as no luggage or other bags;

   h. Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

   i. A group of girls appears to be traveling with an older female or male;

   j. A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

   k. Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

   l. Possession of bulk sexual paraphernalia such as condoms or lubricant;

   m. Possession or use of multiple cell phones;

   n. Paying nightly for extended stays with cash; and

   o. Possession or use of large amounts of cash or pre-paid cards.

General, Human Trafficking Red Flags, available at: https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf.

■ **VICTIM'S VOICE, LLC** ■

100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

p. Individuals avoid eye contact and interaction with others;

q. Individuals have no control over or possession of money or ID;

47. The Harboring Defendant was aware or should have been aware of these signs of forced sex trafficking when operating and managing the harboring hotel, when enacting and enforcing policies and procedures applicable to that hotel, and when training, educating, and supervising the staff of said hotel, and when dealing with Plaintiff and her Traffickers.

48. Given the prevalence of forced sex trafficking in hotels and the abundance of information about how franchisors, owners, and hotel employees can identify and respond to sex trafficking, it is obvious that the decision of a hotel chain to continue generating revenue from sex traffickers without taking reasonable steps to identify and prevent forced sex trafficking in its hotels is purposely made in its own financial interest by facilitating and participating in the forced sex trafficking.

49. Accordingly, many hotels – upon information and belief, including the hotel(s) and franchisor(s) involved in the present suit – have told the public that they have assumed the duty and responsibility to stop sex trafficking in their hotels. Particularly for those who are signatories of The Code, as described above.

50. Unfortunately for J.B., the Harboring Defendant's promises have proved empty. The Harboring Defendant failed to take any action in response to its actual knowledge of forced sex trafficking, including the forced sex trafficking of J.B. Instead, the Harboring Defendant has continued to financially benefit from providing a venue for sexual exploitation of victims, including J.B., who was repeatedly sexually assaulted, again and

again, for 4 years at the Super 8.

**J.B. Was Forcibly Sex Trafficked at the Super 8**

51. J.B. is a survivor of human sex trafficking, and her life story reads like a tragedy.

52. For approximately 4 years from 2020 to the end of 2024, J.B. was forced to be a sex slave in a sex trafficking venture between the Harboring Defendant and her sex Traffickers at the Super 8.

53. A few months earlier, while still in high school, 16-year-old J.B. first met her trafficker, "Graham."

54. Graham exploited J.B.'s having recently run away from a difficult home by telling her he loved her, he would take care of her and he would give her money and a home to live in.

55. Instead of helping J.B., Graham brought her to the Harboring Defendant's hotel, he took her phone and her other possessions, he restrained her, imprisoned her, raped her, threatened her, beat her, and announced he was her pimp, and she would now be working for him and his associates. He forced her to work as his sex-slave, forcing her to perform commercial sexual acts with strangers and kept all the money, leaving J.B. totally captive, drugged and dependent on him, with no means of escape.

56. During this time Graham controlled every aspect of J.B.'s life: he threw away her phone and most of her possessions and kept her money and ID; He restricted her access to food, hygienic necessities, clothing, and sleep; He turned her into an object of commerce by forcing her to wear a sexually explicit "uniform" of his choosing marking her as a sex slave who was always "on the clock"; He threatened her with extreme violence and death if she refused to comply with the sexual demands of complete strangers or if she attempted to

disobey him; He drugged her, he constantly surveilled and physically restrained her; he would not let her speak on a phone without his supervision; he would tightly grip her wrist and forcibly escort her to and from the Harboring Defendant's rooms and, simply put, he forced her to be a subhuman slave he sexually exploited for his own profit with absolutely no regard to her wellbeing or her humanity.

57. J.B. was sexually assaulted thousands of times while at the Harboring Defendant's hotel, including by Graham, and by the Harboring Defendant's owner, managers, employees and/or agents.

58. For 4 years J.B. was just a sexual object - bought, sold and sexually abused by anyone who paid; this has permanently and catastrophically altered J.B.'s life.

59. As can be reasonably expected, the indicia of being forcibly sex-trafficked, every day, for 4 years were omnipresent, open and obvious to the Harboring Defendant.

60. In fact, the Harboring Defendant was specifically trained to identify the open and obvious signs that J.B. was being forcibly sex trafficked and had crafted policies to report sex trafficking. But because the Harboring Defendant willingly participated in this venture with J.B.'s Traffickers, it eschewed its own policies, refused to report what it saw and gladly profited from J.B.'s sex-trafficking.

61. The omnipresent signs of J.B.'s trafficking included:

    a. 16-year-old J.B. was forced to perform commercial sex acts through force, fraud, and coercion, by physically and mentally abusing her, and by threatening her with harm to herself or her family, and by referencing other individuals he had harmed. Much of his physical, verbal and emotional abuse was conducted openly in plain view of the hotel managers and/or staff;

    b. J.B. and/or her Traffickers were allowed to pay for rooms with cash or prepaid

credit cards, and refused at times to give identification, which, is against industry standards and upon information and belief against hotel policy.

c. J.B. and/or her Traffickers rented rooms consistently, repeatedly and for extended stays but always paid rental fees daily, almost always in cash;

d. J.B.'s Traffickers selected the Super 8 as the location where Plaintiff was trafficked and either paid directly for the hotel rooms or forced Plaintiff to pay for the rooms in her name;

e. The Harboring Defendant asked J.B.'s Traffickers if they were renting the rooms for a brief period (rather than the entire night), despite hotel policy of a one night minimum;

f. Harboring Defendant continuously renewed their business relationship with J.B.'s Traffickers over an eight-month period by re-renting rooms to them despite its actual and constructive knowledge that J.B. was being forcibly sex-trafficked by Traffickers at its hotel;

g. For years J.B.'s Traffickers had prior dealings with the Harboring Defendant by sex trafficking other girls at its hotel, which were reinstated by trafficking Plaintiff;

h. J.B.'s Traffickers told J.B. they stayed at the Super 8 because he knew the Harboring Defendant would protect them based on prior dealings with them;

i. When J.B. was first checked into the Super 8, the Harboring Defendant appeared to indicate that Traffickers were long-time, repeat customers as they were greeted with friendly gestures such as "high fives" and comments that they were "back in business";

j. Although J.B. and her Traffickers stayed for extended periods they had little or no luggage, bags, backpacks, etc., with them;

k. Multiple men per day came and went from J.B.'s rooms in clear view of the Harboring Defendant without luggage or personal possessions;

l. J.B. did not have access to her identification card or money, which was controlled by her Traffickers;

m. The Harboring Defendant's owner, managers, employees and/or agents could see that Plaintiff was very young to be continuously seen with random men, often significantly older than her;

n. J.B. was forced to wear clothing that was skimpy, inappropriate for the weather, sexually explicit, covered very little of her body, lacked underwear, and inappropriate for her age, circumstances and was sometimes tattered;

o. Harboring Defendant permitted Plaintiff to solicit men for commercial sex on premises, including the lobby and front desk area while they were present;

p. Harboring Defendant interacted with Plaintiff frequently and she was often under physical restrained by her Traffickers;

q. J.B. would frequently go to the front desk and interact with Harboring Defendant, including to purchase condoms if and when they were available;

r. J.B. showed signs of malnourishment, such as being emaciated, poor hygiene, fatigue, sleep deprivation, and facial blemishes from drug-induced compulsive skin picking;

s. J.B. showed signs of physical and mental abuse upon arrival and throughout her stay, such as cuts, scrapes, scratches, welts, red marks, bruises, split lips, black eyes, patches of missing hair, cigarette burns, fear, anxiety and nervousness (by not making eye contact), which were ignored by Harboring Defendant;

t. J.B., who was kept in a drugged state by her traffickers, exhibited obvious signs of disorientation and impairment;

u. J.B. was frequently yelled at by her Traffickers in a way that could be heard by customers and Harboring Defendant, especially when being punished or tortured by him;

v. Excessively loud noises were often heard by Harboring Defendant when they were within earshot of Plaintiff's room arising from disputes related to money or services or physical abuse between J.B. and/or Traffickers and their customers;

w. J.B. overheard Harboring Defendant directing other employees to "double check" for cops, or that police were on the way and to warn Traffickers of the police's arrival;

x. J.B. overheard Traffickers discussing her as an object to be trafficked with the Harboring Defendant when he first brought her to the property suggesting things like she was a "good earner" or she would be "no problem";

y. J.B. overheard the Harboring Defendant tell her Traffickers that prostitution was bringing in a lot of money.

z.  J.B. would frequently pass through the hotel lobby crying.

aa. Harboring Defendant would make disapproving faces at J.B., roll their eyes, show visible disgust, and would mock her as she passed through the property, often under physical restraint by her Traffickers in plain view of Harboring Defendant;

bb. J.B. attempted to escape several times and was forcibly returned to the hotels by her Traffickers, who would grab her and kick or strike her to subdue her, in plain view of Harboring Defendant, who did nothing to assist her or report her situation to the police;

cc. J.B. was constantly monitored by her Traffickers when she was in the hotel lobby, general areas and rooms;

dd. J.B. was not allowed to communicate with Defendant's employees without her Traffickers present, was not allowed to sign in, was not allowed to have a key to her room, was not allowed to pay for her room without her Traffickers present, and was not allowed to make direct eye contact with Defendant's employees;

ee. J.B. often refused to make eye contact with Harboring Defendant due to fear, embarrassment and threat to her safety, which is a known sign of sex trafficking;

ff. Harboring Defendant witnessed up to 15 non-hotel guests visit J.B.'s room per day for short, 20-minute stays, often throughout the night, and ignored same;

gg. Harboring Defendant saw J.B.'s room had obvious signs of sex trafficking, including large amounts of sex and drug paraphernalia, including a number of condom boxes and condoms in the room and in the trash;

hh. J.B.'s Traffickers would frequently decline housekeeping services for many consecutive days;

ii. Harboring Defendant noticed J.B.'s room was messy and had an unclean smell due to infrequent cleaning during extended stays;

jj. J.B.'s Traffickers would request far more sheets and towels than expected, often at odd times;

kk. The Harboring Defendant received an unusually large volume of dirty sheets and towels, often covered with bodily fluid and occasionally blood;

ll. Harboring Defendant collected money from Traffickers in J.B.' room;

mm. Harboring Defendant would go to the rooms where J.B. was being trafficked while she was with sex buyers and she would often answer the door naked;

nn. The Harboring Defendant saw cash, drugs, condoms and guns in Traffickers' room while he and J.B. were present;

oo. Harboring Defendant was in J.B.'s room while she was sex trafficked;

pp. Some of the "Johns" were Harboring Defendant employees;

qq. The Harboring Defendant bartered with Traffickers to provide the rooms where Plaintiff was harbored in exchange for drugs or sex with her;

rr. "Johns" frequently used the on-premises ATM just before heading to J.B.'s room;

ss. The Harboring Defendant refused to assist J.B. on multiple occasions when she attempted to send messages to the police or her family to help her escape;

tt. The Harboring Defendant refused to assist J.B. when she requested to use the telephone and left the lobby when Traffickers entered, leaving her alone with him;

uu. The Harboring Defendant witnessed a "John" fleeing a motel room after physically assaulting J.B., and ignored her pleas for help as she ran from the room bleeding and with torn clothing;

vv. The Harboring Defendant cleaned blood that was sometimes left on the walls and floor of Plaintiff's room after her Traffickers beat her and they saw her with signs of abuse but refused to intervene or call authorities;

ww. Traffickers loitered in his car in the parking lot all night while J.B. and sometimes "Johns" made frequent trips to his vehicle to deposit cash; he "backed in" to avoid license plate detection and often had other girls he was trafficking with him;

xx. Traffickers openly conducted the joint trafficking venture and carried a gun;

yy. The Harboring Defendant operated as lookouts and informants while acting in the course and scope of their employment and for the benefit of their employer warning J.B.'s Traffickers when law enforcement was approaching, or customers were complaining in order to conceal J.B. and her Traffickers;

zz. The Harboring Defendant sexually assaulted Plaintiff while acting in the course and scope of their employment in exchange for providing services to Traffickers, such

as acting as lookouts, providing drugs, or discounting rooms;

aaa. The Harboring Defendant warned J.B.'s Traffickers whenever she attempted to leave the hotel property;

bbb. The Harboring Defendant re-rented rooms to J.B.'s Traffickers for 4 years knowing (or they should have known) they were being used to harbor her for sex trafficking;

ccc. Traffickers often rented multiple rooms at a time and had multiple girls with him;

ddd. By renting rooms to J.B. and her Traffickers, Harboring Defendant were knowingly associating with her Traffickers and forcing Plaintiff to be sex trafficked in order to serve their business objectives.

eee. There was a booming sex trafficking industry at the subject hotel before and during the time that J.B. was being trafficked;

fff. One of the rooms where J.B. was trafficked was just a few doors down from the lobby;

ggg. Harboring Defendant moved J.B., to a more secluded room in the back of the hotel to help conceal her Traffickers' activities after another hotel resident complained about trafficking;

hhh. J.B. witnessed Harboring Defendant warn Traffickers when there was too much activity coming from J.B.'s room and suggested that he should relocate rooms to avoid detection;

iii. After Traffickers and J.B. were relocated to a more secluded area of the hotel, other sex traffickers were relocated to the same area;

jjj. There was other sex trafficking activity in the area where J.B. was relocated;

kkk. The Harboring Defendant covered up sex trafficking activities when police came to the hotel to investigate allegations of prostitution by denying and failing to disclose J.B., her Traffickers or other trafficking and prostitution to the police;

lll. The Harboring Defendant showed indifference to J.B.'s obvious physical deterioration and injuries;

mmm. The Harboring Defendant was given a share of the profits through tips, bonuses, bribes, kickbacks, and other remuneration for the use of the hotel rooms, wi-fi,

towels, sheets, and other supplies used in the sex trafficking enterprise and for providing warnings, keeping quiet and moving them when in danger;

nnn. The hotel was in an area known to be used for drugs, trafficking, and prostitution;

ooo. J.B.'s Traffickers conducted multiple illegal drug sales at the hotel while J.B. was being trafficked;

ppp. Harboring Defendant failed to hire security personnel to curb the sex trafficking present at the hotel;

qqq. Harboring Defendant failed to post legally mandated anti-trafficking signs and notices on the property;

rrr. Harboring Defendant controlled the training, policies, protocols, rules, and guidelines at the hotel. Given the availability of training materials from the American hotel Lodging Association, ECPAT-USA, and other resources, Harboring Defendant knew or should have known of the "critical role" that the hotel industry plays in "enabling" the sex trade, and of the "widespread national epidemic of hotel/motel sex trafficking." Despite that, the Harboring Defendant failed to adequately implement education, training, and policies to prevent sex trafficking at its hotel. Because of the Harboring Defendant's failures, J.B. was repeatedly victimized and trafficked for sex on the hotel's premises; and

sss. The Harboring Defendant "knowingly benefited" from J.B. being sex trafficked because it received payment for the rooms rented to individuals it knew or should have known were engaged in sex trafficking. They also financially benefitted from payments received for her Traffickers' use of hotel Wi-Fi, which enabled the subject sex trafficking to occur, as Traffickers advertised J.B. on common internet sex-trafficking websites such as "Backpage.com," and others like it.

62. Not only was J.B.'s forced sex trafficking open and obvious, but the Harboring Defendant and its employees were uniquely positioned to observe its signs, should have observed its signs and did observe its signs. Additionally, Harboring Defendant constantly monitored guest activity on the premises and was well-trained to identify and report any sex trafficking, which it willingly chose not to do.

63. In fact, the Harboring Defendant's employees had conversations with J.B., observed her

entering and leaving the premises, observed her in the lobby area, and directly interacted with her. They frequently reacted to J.B.'s presence in the hotel either with social cues of disgust, such as eye rolling, frowning, head shaking, or making derogatory statements under their breath, or with knowing and salacious statements, leering, attempted groping, actual groping, or salacious comments regarding sex or J.B.'s availability for sex, and/or bartered, paid for or were rewarded with forced sex directly with her as payment for look-out services, room rentals, or as a share of profits.

64. The open and apparent nature of J.B.'s forced sex trafficking activity is confirmed by the fact that multiple guests made complaints and wrote bad reviews about sex trafficking activities. For example, multiple guests indicated they had made complaints to J.B and the Super 8 in publicly available reviews including the following excerpts against the Harboring Defendant:

   a. Prostitutes, Drug Dealers, and Gang Members!! OH My!!... Upon check, 3 rooms from me was a sexual battery crime scene. Prostitutes and drug deals were going on all over the property... This hotel is a LIVE IN hotel for Prostitutes, drug dealers and gangs!!!!!! DO NOT STAY HERE!!

   b. ...terrible motel. The last time I stayed at this super 8, a hooker approached me in the parking lot and I informed you . this time there was a drug dealer in the next room, cars coming and going all day & night a car would pull up and one person foes inside and 5 minutes later comes out. When I was checking out I told the desk clerk and the girl in the office says oh I know who that is. Well if you knew about why was he still there.

   c. This was the worst motel I have ever stayed at! Between the hookers, drug dealers and homeless people......it was awful!

   d. ...hookers and drug dealers actively pursuing their trade out in the open!

   e. Because there was drug trafficing [sic] and prostitution on the grounds, there was

a police office harrissing [sic] everyone on the property...

 f. It was clear that there was a prostitution ring and drug deals happening here and that management was in on it. We were told by management that we needed to leave the check in the desk while a fifth was taking place over who was getting the next "call" that just arrived and to come back in a little bit. The manager was trying to solve the issue.. Why weren't they calling the police instead!!!!...And all night long you could hear the "activity" taking place in the rooms surrounding...

 g. ...drug infested, hookers, trashy, infested...they rent to hookers, low life, drug users...

65. While actively participating in this sex-trafficking venture with her Traffickers the Harboring Defendant's management and employees, were acting in the course and scope of their employment specifically and explicitly for the benefit of their employers and of the hotel.[6]

66. The actions and knowledge of the Harboring Defendant's staff, taken within the course of their employment for Defendant's benefit, are imputed to the Harboring Defendant. *Doe v. Hotels*, 2024 WL 2955728, at *5.

67. Additionally, J.B. witnessed clear signs of forced sex trafficking of other victims that the Harboring Defendant knew or should have been aware of:

 a. J.B. saw other sex traffickers and their victims openly operating and being forcibly escorted to and from the rooms by other traffickers at the subject hotels during the time that she was being trafficked at Harboring Defendant's property;

 b. J.B. met other sex trafficking victims at the subject hotels who appeared to be minors during the time that she was trafficked there;

---

[6] The TVPRA permits agency liability. *Doe v. Hotels*, 2024 WL 2955728, at *5 (M.D. Fla. 2024) (citing *Treminio v. Crowley Maritime Corporation*, 649 F.Supp.3d 1223, 1232 (M. D. Fla. 2023), 649 F. Supp. 3d at 1232 (collecting cases and declining to dismiss TVPRA claim against corporation for violative acts of its employees)). An employer can be held liable for the tortious or criminal act of an employee if the act was committed during the course of employment to further a purpose or interest of the employer. *Id.* (citing *Doe v. St. John's Episcopal Par. Day Sch., Inc.*, 997 F. Supp. 2d 1279, 1287–88 (M.D. Fla. 2014)).

c. J.B. witnessed other victims in their sexually explicit "uniforms" loitering around the subject hotel in plain view of the Harboring Defendant with visible signs of coercion (cuts, abrasions, bruises, bandages, etc.);

d. J.B. witnessed other victims in plain view of the Harboring Defendant strung out on drugs;

e. J.B. witnessed other victims in plain view of the Harboring Defendant looking exhausted and haggard due to forced sex work at all hours of the day for many days at a time;

f. J.B. witnessed other victims in plain view of the Harboring Defendant in their "uniforms", which were inappropriate for the location and weather;

g. J.B. witnessed other victims making repeated trips to the parking lot to deposit cash with traffickers, in plain view of the Harboring Defendant often the traffickers had much nicer vehicles than you would expect at a budget hotel;

h. J.B. witness other victims with obvious "Johns" coming in and out of the hotel rooms in plain view of the Harboring Defendant's owner, managers, employees;

i. J.B. witnessed other victims and their traffickers temporarily propping open doors, and she noticed doors propped open after hours so "Johns" might have easier access.

68. The Harboring Defendant knew or should have known that J.B. was being forcibly sex trafficked on its property. In fact, it wittingly participated in this venture by harboring J.B. for sex trafficking, ignoring the obvious signs and purposely eschewing their own policies to increase their profits.

**J.B. was Harbored as Part of Sex Trafficking Enterprise**

69. J.B.'s Traffickers and the Harboring Defendant participated in a sex trafficking enterprise that worked like this:

a. Traffickers booked a room at the Harboring Defendant's hotel, requesting a specific type of room – either secluded from the rest of the guests (in the trafficking wing), or with sight lines to the road so law enforcement can be easily spotted (a clear sign of sex trafficking and a dog whistle for the hotel that Traffickers had a

prior relationship there) (this would be done upon check-in if the first night was rented online or through a corporate website);

b. Traffickers posted internet ads for J.B.'s commercial, sexual availability using hotel Wi-Fi from his "burner" phone, typically while loitering in the parking lot. "Johns" would call, J.B.'s price was negotiated, and the "John" was sent to the room;

c. The "John" was either met in the lobby and escorted to the room, or; the "John" would request J.B.'s room number from hotel staff, or; the "John" would otherwise be directed to J.B.' room (10-15 "Johns" per night, 20-minute stays to the same room is a clear sign of trafficking);

d. The "John" paid J.B. for the commercial sex act in the room, the act was consummated, and the "John" would leave. J.B. then exited the room, ran to the parking lot and deposited the cash with her Trafficker who was loitering in his car in the lot (10-15 trips per night, a clear sign of trafficking);

e. While J.B. performed sex acts with the "John," Traffickers loitered in the parking lot of the hotel, often in a luxury vehicle, heavily tinted with aftermarket modifications, backed into a space, which doubled as his office, where he ran the enterprise (clear signs of trafficking);

f. During the busiest hours of the evening, hotel staff looked out for law enforcement and disturbances or complaints by other guests, warning J.B.'s Traffickers of same so the enterprise would not be disrupted (awareness of trafficking);

g. Based on complaints, tips or suggestions from Harboring Defendant, sometimes J.B. would be relocated to a different room (a clear sign of trafficking);

h. In the morning, Traffickers used cash from the previous night's trafficking as payment to rent another room for one additional night so J.B. could be trafficked on an ongoing basis, and sometimes tips would be presented to Harboring Defendant and its employees; this process of renting in cash one night at a time was repeated over and over even during long-term stays at the hotel (clear signs of trafficking);

i. J.B.'s Traffickers also engaged in the commercial sale of illegal drugs on premises with sales taking place either in the hotel room or in public areas of the hotel often to hotel staff or used to barter with Harboring Defendant;

j. Traffickers routinely stayed at the Harboring Defendant's hotel for consecutive weeks but always only paid for one night at a time, almost always with cash (a clear sign of sex trafficking);

k.  J.B. and her Traffickers would have little to no luggage or personal possessions for extended stays and she always wore her sexually explicit "uniform" (a clear sign of sex trafficking);

l.  J.B. was confined to her room for long periods of time, but would occasionally loiter on property soliciting "Johns" when the occasion arose and she rarely was seen leaving the premises, and rarely without Traffickers or another, often significantly older handler (a clear sign of sex trafficking);

m.  J.B.'s rooms consistently displayed "Do Not Disturb" signs on the doors to the room where the Plaintiff was engaged in commercial sex acts, often for weeks at a time (a clear sign of a sex trafficking enterprise);

n.  "Johns" frequently entered and left J.B.'s room at all times of day and night – typically 10 to 15 times a night – and they never had luggage, bags or any indication they were guests (a clear sign of sex trafficking);

o.  After a few weeks of safe harbor and cooperation from the Harboring Defendant, Traffickers would take J.B. to a new property temporarily, only to return shortly for another extended stay in the safe confines of the Super 8.

p.  16-year-old J.B. was forced to be a sex slave for 4 years of her life when she should have been with her family, out making friends, possibly even getting married and having her own family; these are years she will never get back.

q.  The Harboring Defendant aided, abetted, facilitated and encouraged the above activities by warning J.B.'s Traffickers regarding police activity, by relocating J.B. to a secluded portion of the hotel to avoid detection by other guests and police, by ignoring Plaintiff's requests for help, by failing to report that J.B. was being forcibly trafficked for sex, and by accepting payment in cash and without identification to conceal Trafficker's illegal activities.

70. For approximately four years J.B. was a sex slave in this enterprise, the routine being repeated with thousands of "Johns," many complaints, contacts between the Harboring Defendant, J.B., and her Traffickers, and yet Harboring Defendant, with all their training, surveillance, observation and expertise chose to participate in the venture rather than intervene on behalf of J.B.

**▪ VICTIM'S VOICE, LLC ▪**
100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

24

71. Despite many, many indicia of forced sex trafficking taking place every day, openly and obviously, in front of Harboring Defendant, never did it attempt to identify or report the sex trafficking of J.B. (or anyone else).

72. Local police were cognizant of the foregoing routine and conduct from afar, making it impossible for the Super 8 to be ignorant of what was occurring right in front of them.

73. J.B.'s trafficker operated with little regard for concealment due to an understanding that the Harboring Defendant would look out for the best interest of their joint sex trafficking venture and warn him of police activity, enabling her Traffickers to operate openly, as he had found a venue where they could conduct their operations without disruption.

74. Sex crimes and human trafficking were reasonably foreseeable to the Harboring Defendant and occurring on their premises, specifically against J.B.

75. Additionally, the Harboring Defendant, individually and/or by their actual or apparent agents, servants, franchisees and/or employees, knew or had constructive knowledge that the sale and usage of illegal drugs were being performed on the premises.

76. Thankfully, through much difficulty, J.B. was eventually able to escape the grasp of her Traffickers and the prison the hotel served as. She escaped her captor/trafficker without any aid or assistance from the Harboring Defendant.

77. J.B. has spent a considerable amount of time attempting to regain the life that was stolen from her by being a forced sex slave.

78. J.B. brings this lawsuit expressly to hold the Harboring Defendant accountable for knowingly benefiting from her sexual trafficking.

**▪ VICTIM'S VOICE, LLC ▪**

100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

25

## VIOLATIONS OF THE TVPRA

79. Section 1591(a) of the TVPRA criminalizes the actions of anyone who knowingly:

(1) recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; or

(2) benefits, financially or by receiving anything of value, from participation in a venture which has engaged in an act described in violation of paragraph (1), knowing, or...in reckless disregard of the fact, that means of force, threats of force, fraud, coercion described in subsection (e)(2), or any combination of such means will be used to cause the person to engage in a commercial sex act[.]

80. Section 1595 of the TVPRA creates two kinds of civil liability: perpetrator liability and participant liability. Since it was first enacted, the statute has allowed the victim to sue "the perpetrator." 18 U.S.C. § 1595(a).

81. The TVPRA provides that "[a]n individual who is a victim of a violation of this chapter may bring a civil action against the perpetrator[.]" 18 U.S.C. § 1595(a). A perpetrator under § 1595(a) is "someone who has violated the criminal statute." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724 (11th Cir. 2021). To establish her claim, Plaintiff must therefore allege sufficient facts that Defendant violated 18 U.S.C. § 1591(a); *Doe #1 v. Crowley Mar. Corp.*, 2024 WL 1346947, at *7 (M.D. Fla. Mar. 29, 2024).

## COUNT I – WEST PALM HOTELS LLC VIOLATED THE TVPRA AS A PERPETRATOR

82. Plaintiff, J.B., hereby adopts and re-alleges each and every allegation in paragraphs one through eighty-one above and further states:

83. J.B. is a victim of sex trafficking within the meaning of 18 U.S.C §1591 and is thus entitled to bring a civil action under 18 U.S.C §1595 against any "perpetrator" of any violation of

the TVPRA.

84. Defendant, WEST PALM HOTELS LLC, is a perpetrator within the meaning of 18 U.S.C §1595 because it violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, ·it harbored J.B. by renting a room to J.B.'s Traffickers and provided him and J.B. with hospitality services despite knowing or in reckless disregard of the fact that J.B. would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at Defendant's Super 8.

85. To "harbor" is "to give shelter or refuge to." *Doe v. Hotels,* 2024 WL 2955728 (M.D. Fla. 2024) (citing Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/harbor; Safe Harbor, Black's Law Dictionary (11th ed. 2019) ("An area or means of protection")); cf. *Doe #1 v. Red Roof Inns, Inc.,* 21 F.4th at 723–25 (analyzing plain meaning of TVPRA provisions by using dictionaries to define terms).

86. Providing lodging to someone for the purposes of obtaining his or her labor or services against his or her will constitutes "harboring" under the TVPRA. *Doe v. Hotels,* 2024 WL 2955728 at (quoting *Mouloki v. Epee,* 262 F. Supp. 3d 684, 698 (N.D. Ill. 2017)); see *United States v. Gatlin,* 90 F.4th 1050, 1060 (11th Cir. 2024) (showing that a defendant "harbors" an individual under section 1591(a) when the defendant allows the individual to stay at the defendant's house (citing *United States v. Mozie,* 752 F.3d 1271, 1286 (11th Cir. 2014)); *Jane Doe K.R. v. Choice Hotels,* 2024 WL 4373374, at *8 (M.D. Fla. 2024) (same).

87. Defendant knowingly harbored Plaintiff with actual knowledge or reckless disregard of the fact that force, threats of force, or coercion would be used to force Plaintiff to engage in commercial sex acts. Defendant is therefore liable for "harboring" Plaintiff under the

TVPRA. *Doe v. Hotels,* 2024 WL 2955728 at *8.

88. Defendant had both actual knowledge of J.B.'s forced sex trafficking and actually participated in her sex trafficking.

89. The facts above show that Defendant entered into either an overt or tacit agreement with Plaintiff's Traffickers to provide them with rooms, shelter, and participated in the trafficking enterprise whereby Plaintiff would be forcibly trafficked for profit.

90. Defendant is a perpetrator within the meaning of 18 U.S.C §1595 because it violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, Defendant knowingly received financial benefit by actively participating in a venture that it knew, or was reckless in not knowing, engaged in unlawful sex trafficking. Specifically, Defendant had an informal, implicit arrangement with sex traffickers, including J.B.'s Traffickers, whereby Defendant received revenue by renting hotel rooms to her Traffickers on an ongoing basis despite knowing, or in reckless disregard of the fact, that these rooms would be used as a venue for the forced sexual exploitation of individuals, specifically, J.B.

91. Further, Defendant, its owner, managers, employees and/or agents, including the owner himself, actively assisted, aided and abetted J.B.'s Traffickers, and participated in operating his sex-trafficking enterprise by operating as police "lookouts," by relocating J.B. and her Traffickers to rooms at its hotel conducive to forced sex trafficking after other guests complained, by purchasing or bartering for sex with J.B. directly, by aggressively ignoring J.B.'s signs of forced sex-trafficking, and by the other means set forth in the above paragraphs.

92. Further, Defendant and its owner/manager had a prior relationship with Plaintiff's Traffickers in which they were involved in sex trafficking previously, including forced sex trafficking, showing that they knew that Traffickers brought her to the harboring hotel for the purposes of forced sex trafficking.

93. Defendant's violations of 18 U.S.C §1591(a) operated jointly with the other unlawful acts and omissions of Defendant, outlined in this Complaint, to cause J.B. to suffer substantial physical and psychological injuries and other harm as a result of being trafficked and sexually exploited.

94. As a direct and proximate result of the above egregious acts of Defendant, J.B. has been permanently injured and damaged physically, emotionally, psychologically, and financially.

WHEREFORE, Plaintiff J.B. demands judgment for damages against the Defendant, WEST PALM HOTELS LLC, in an amount in excess of Fifty Thousand Dollars ($50,000.00), costs, interest, attorneys' fees, if allowable by law, and such other and further relief as the Court deems just and proper, both in law and in equity. The Plaintiff further demands trial by jury as to all issues triable as a matter of right to a jury.

## COUNT II – WEST PALM HOTELS LLC BENEFITTED FROM THE FORCED SEX TRAFFICKING OF J.B.

95. Plaintiff, J.B., hereby adopts and re-alleges each and every allegation in paragraphs one through eighty-one above and further states:

96. Plaintiff was a victim of sex trafficking within the meaning of 18 U.S.C. § 1591 and Defendant, WEST PALM HOTELS LLC, was a "beneficiary" of that sex trafficking within

the meaning of 18 U.S.C. § 1595(a)(2).

97. Defendant knowingly received a financial benefit from participating in a venture with Plaintiff's Traffickers, even though it knew or should have known that her Traffickers were engaged in violations of 18 U.S.C. § 1591(a)(1) and 18 U.S.C. § 1591(a)(2). Thus, Defendant is liable to J.B. as a sex trafficking beneficiary under the TVPRA.

98. Beneficiary liability under the TVPRA arises when a defendant "participat[es] in a venture which that person knew or should have known has engaged in an act in violation of [the TVPRA]." 18 U.S.C. § 1595(a)(2).

99. To establish a TVPRA beneficiary claim pursuant to § 1595(a), the plaintiff must show that the defendant (1) knowingly benefited (2) from taking part in a common undertaking or enterprise involving risk and potential profit, (3) that the undertaking or enterprise violated the TVPRA, and (4) that the defendant had constructive or actual knowledge that the undertaking or enterprise violated the TVPRA as to the plaintiff. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 719.

**Defendant Knowingly Benefitted from Plaintiff's Traffickers' Sex Trafficking Enterprise**

100. The first element of a TVPRA beneficiary claim requires a plaintiff to allege that Defendant "knew it was receiving some value from participating in the alleged venture." *Doe #1 v. Red Roof Inns*, 21 F.4th at 724. For this element, the Court is not concerned with whether Defendant participated in a venture, but only with whether Defendant knowingly benefited from the trafficking enterprise – either "financially or by receiving anything of value." *Id.*

101. In the context of a hotel operator, a plaintiff may establish that a defendant knowingly benefited under the TVPRA by "repeatedly renting rooms that defendant knew or should have known were being used for sex trafficking." *Doe v. Hotels*, 2024 WL 2955728, at *7 (citing *A.D. v. Holistic Health Healing Inc.*, 2023 WL 3004546, at *3 (M.D. Fla. Apr. 19, 2023)).

102. A hotel's receipt of revenue from room rentals is a financial benefit from a relationship with a trafficker sufficient to satisfy the first element of the TVPRA standard. See *Does 1-4 v. Red Roof Inns, Inc.*, 688 F.Supp.3d 1247, 1253-54 (N.D. Ga. Aug. 10, 2023) (receipt of room rental revenue constituted a "benefit" under § 1595(a)).

103. It has been set forth above in detail that Defendant knowingly received such revenue from Plaintiff's Traffickers and knew or should have known that J.B. was being sex trafficked. Plaintiff's Traffickers paid Defendant for the hotel rooms in which Plaintiff was trafficked to men for sex. Plaintiff's Traffickers selected Defendant's hotel as the location where Plaintiff was trafficked and either paid directly for the hotel rooms or forced Plaintiff to pay for the rooms in her name. Plaintiff's Traffickers were repeat customers at Super 8 and had a prior relationship with Defendant, as discussed above.

104. Further, Defendant received more than simply room rentals as a benefit of Traffickers' sex trafficking enterprise. In addition, Defendant received other financial benefits in the form of food sales, beverage sales, parking fees, condom sales, ATM fees, wi-fi fees, and portions of Plaintiff's Traffickers' profits in the form of tips, bribes, sexual favors, and payments, from those persons who were engaging in sex trafficking. Defendant received consistent cashflow from Plaintiff's Traffickers and other traffickers from renting multiple

rooms over multiple nights over many months.

105. Defendant knowingly benefited from Plaintiff's trafficking through monies coming in through fees from room rentals, Wi-Fi, parking, on-premises vending, tips, kickbacks, portions of Plaintiff's Traffickers' profits, ATM fees, etc., and other benefits such as assurances of consistent occupancy, information gleaned from hotel loyalty programs, attractiveness to other trafficking enterprises, avoiding excessive police attention, etc.

106. There are ample facts described above establishing that Defendant knowingly received revenue from J.B.'s Traffickers with actual or constructive knowledge that she was forcibly sex trafficked.

### Defendant Knowingly Benefitted from Participating in a Venture

107. To establish the second element of a TVPRA beneficiary claim, a plaintiff must plead facts to establish that the defendant knowingly benefitted "from participating in a venture." see *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 724.

108. "Venture" is defined as an "undertaking or enterprise involving risk and potential profit," and participation as "to take part in or share with others in common or in an association." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 724–25. Thus, to plead this element, Plaintiff must allege that Defendant took part in a common undertaking or enterprise with Plaintiff's Traffickers involving risk and potential profit. *Id.*

109. Allegations that a Plaintiff's trafficker had prior commercial dealings with the operator, which the parties wished to reinstate for profit, establish a hotel operator's participation in a venture with a sex trafficker. *Doe #1 v. Red Roof Inns, Inc.*, 21 F. 4th at 725–26 (citing *Ricchio v. McLean*, 853 F.3d 553, 556–58 (1st Cir. 2017)).

### ▪ VICTIM'S VOICE, LLC ▪
100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

110. Defendant took part in a common venture involving risk or profit with J.B.'s Traffickers

as described in greater detail above, including:

   a. Harboring Defendant provided lodging to Plaintiff's Traffickers for a common goal of the forced sex trafficking and to profit from the forced sex trafficking of J.B.;

   b. Harboring Defendant directly rented rooms to people it knew or should have known were engaged in sex trafficking including the trafficking of Plaintiff;

   c. Harboring Defendant had continuing commercial dealings with Plaintiff's Traffickers, including a course of business that involved accepting cash payments for room reservations, looking out for law enforcement on behalf of Plaintiff's Traffickers while J.B. was being forcibly trafficked, moving Plaintiff's Traffickers and J.B. away from the prying eyes of law enforcement when necessary and providing isolated rooms away from normal foot traffic of hotel guests, but which were easily accessed by sex-trafficking customers by back or side doors, which Defendant, its owner, managers, employees and/or agents would leave unlocked and unmonitored;

   d. Harboring Defendant had a continuous business relationship with Plaintiff's Traffickers such that Defendant established a pattern of conduct with said Traffickers;

   e. Harboring Defendant associated with Plaintiff's Traffickers by facilitating their trafficking enterprise as set forth above, and by facilitating J.B.'s captivity as set forth above;

   f. Harboring Defendant ensured that Plaintiff's Traffickers' room rentals were limited to certain areas of the property that were isolated and sequestered, such that the Defendant was aiding in hiding the trafficking from police and others who might report it to the police and was thereby furthering the venture;

   g. Harboring Defendant provided discounts and free rooms in exchange for sexually assaulting Plaintiff;

   h. Harboring Defendant shared in Plaintiff's Trafficker's profits, and were given tips and bonuses for being helpful to the Traffickers, sometimes after busy nights or providing information, portions of which were shared directly with Defendant;

   i. Harboring Defendant purposely crafted a safe environment for the set trafficking venture by ignoring massive amounts of nightly short-term traffic to J.B.'s room, J.B.'s repeated trips to deposit money to Plaintiff's Traffickers in the parking lot,

her pleas to help her escape (including running naked through the lobby and soliciting assistance) and bent its own rental policy by accepting cash for nightly rentals without ID (from an obvious minor);

j.  Harboring Defendant observed Traffickers engaging in actions that clearly indicated they were trafficking J.B. (treating her poorly, lacking freedom of mobility, depositing money to Traffickers in the parking lot, paying daily in cash for rooms during extended stays, etc.), and acted to protected the Traffickers and the trafficking enterprise (ignored J.B.'s inappropriate dress, ignored her pleas for help, refused to investigate disturbances or report trafficking to police – even when police inquired, etc.).

111. Defendant had a continuous business relationship with Plaintiff's Traffickers due to their prior sex-trafficking history, which Plaintiff's Traffickers indicated was the reason they returned to the harboring hotel to forcibly sex-traffic J.B., knowing that Defendant, its owner, managers, employees and agents cooperated with and participated in the sex trafficking venture.

112. Defendant's owner/manager welcomed Plaintiff's Traffickers when they returned to the hotel to begin their sex trafficking enterprise with J.B., making it clear they had prior relations.

113. J.B. had been beaten and raped, and was bruised, cut, marked, emaciated, exhausted, and showed obvious signs of forced sex trafficking when she was first brought to the hotel and first met Defendant's owner/managers, who ignored her condition when he welcomed Plaintiff's Traffickers back to the harboring hotel; these indicia were visible to Defendant's employees and agents throughout on her confinement at the hotel.

114. Plaintiff's Traffickers had prior commercial dealings with Defendant in which he sexually trafficked other victims at its hotel in violation of the TVPRA. Plaintiff's Traffickers and Defendant's owner/managers agreed to reinstate their prior relationship for profit, and

Defendant's owner/managers was aware that J.B. was being used as a sex slave. A hotel operator participates in a venture with a sex trafficker when the trafficker "had prior commercial dealings" with the operator, "which the parties wished to reinstate for profit." *Ricchio*, 853 F.3d at 555; *Doe #1 v. Red Roof Inns*, 21 F.4th at 725.

115. Defendant did much more than just rent rooms to sex traffickers and observe signs of trafficking. As stated above, there was a booming sex trafficking business at the hotel. Other traffickers sold girls for sex at the hotel in the timeframe relevant to J.B.'s being forcibly sex trafficked at the hotel. Plaintiff alone was trafficked to thousands of men during the time that she was captive on the property.

116. Defendant's owner/managers openly discussed the details of J.B.'s forced sex trafficking in front of her. Plaintiff's Traffickers never hid the fact that J.B. was being forcibly sex-trafficked from Defendant's owner, managers, employees or agents, openly abusing her and controlling her in public, forcing her to openly solicit customers on the property, forcibly escorting her to and from the lobby of the hotel in front of Defendant's owner, managers, employees and agents, and openly displaying her with bruises, scratches, marks, cuts, and other signs of her confinement and abuse.

117. Moreover, the evidence directly links specific conduct by Defendant's owner, managers, employees and agents to the advancement of Plaintiff's Traffickers' sex trafficking enterprise. Defendant's owner, managers, employees and agents assisted Plaintiff's Traffickers by acting as lookouts for him, and by informing Plaintiff's Traffickers of police activity at the harboring hotel, as well as warning Plaintiff's Traffickers about guest complaints and high visitor traffic drawing unwanted attention to the sex trafficking

enterprise.

118. Further, Defendant's managerial staff directed its employees to relocate Plaintiff (and her Traffickers) in response to customer complaints and police visits to assist Plaintiff's Traffickers in concealing the joint trafficking enterprise.

119. Defendant's owner, managers, employees and agents permitted J.B. and other victims, who were consistently scantily clad, to solicit sex on premises including in and around the lobby and desk area of the hotel.

120. Defendant's owner, managers, employees and agents maintained an ongoing relationship with Plaintiff's Traffickers.

121. Defendant's owner, managers, employees and agents failed to act when they saw J.B. openly beaten, abused, injured, and confined while they were present. Defendant's owner, managers, employees and agents nonchalantly ignored the J.B.'s pleas for help and her visibly battered and bruised condition. They saw Plaintiff's Traffickers physically force J.B. back to her room when she tried to escape.

122. Defendant participated in the profit of a joint sex trafficking enterprise by keeping its rooms rented rather than sitting vacant, by accepting tips, bribes and bonuses from Plaintiff's Traffickers, and by attracting other sex traffickers who became aware that the harboring hotel was a "haven" for sex trafficking where they could operate without the threat of management interference and with safeguards against police interference.

123. There was "profit" for Defendant and Plaintiff's Traffickers alike. Defendant received consistent cashflow and security from Plaintiff's Traffickers renting multiple rooms for multiple nights over 4 years. And Plaintiff's Traffickers profited from operating in an

environment that was hospitable to trafficking – one in which hotel employees would, among other things, not call the police, permit trafficking victims to solicit men in hotel common areas, visit traffickers' rooms to inquire if trafficking victims needed anything, and have sex with trafficking victims.

124. There was also a shared risk for Defendant and Plaintiff's Traffickers, in that police frequently came to the hotel, sometimes to investigate prostitution. Moreover, Defendant took the risk of loss of business due to bad reviews, guest complaints, and damage to the hotel itself from ongoing criminal activity.

125. Defendant participated in a venture where the acts and omissions of its owner, managers, employees and agents served to support, facilitate, harbor, and otherwise further the Traffickers' sale and victimization of Plaintiff for commercial sexual exploitation by repeatedly renting rooms to Plaintiff's Traffickers who they knew or should have known was engaged in the forced sex trafficking of J.B.

126. The above allegations establish that Defendant participated in a venture with J.B.'s Traffickers under the second element of TVPRA beneficiary liability. See *I.R. v. I Shri Khodiyar, LLC*, 723 F.Supp.3d 1327, 1337-38 (N.D. Ga. 2024); *K.H. v. Riti, Inc.*, 2024 WL 505063, at *3 (11th Cir. 2024); *S.Y. v. Marriott Int'l, Inc.*, 2021 WL 2003103, at *4 (M.D. Fla. 2021).

**The Venture Violated the TVPRA as to the Plaintiff.**

127. To establish the third element of a beneficiary claim, "the venture in which the defendant participated and from which it knowingly benefited must have violated the TVPRA as to the plaintiff." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725.

128. The venture between Plaintiff's Traffickers and Defendant engaged in violations of 18 U.S.C. § 1591(a). Section 1591(a) "makes it a crime to 'knowingly' harbor or solicit a person for commercial sex while 'knowing...that means of force, threats of force, fraud, coercion..., or any combination of such means will be used to cause the person to engage in a commercial sex act'" and also "prohibits anyone from knowingly 'benefit[ting], financially or by receiving anything of value' from 'knowingly assisting, supporting, or facilitating a violation of subjection (a)(1)." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725 (citing 18 U.S.C. § 1591(a)).

129. Plaintiff was a victim of human trafficking at the harboring hotel and that her trafficking was the result of an "implicit agreement" between her Traffickers and the harboring hotel owner, managers, employees and agents to facilitate her trafficking through, among other things, the rental of hotel rooms, acting as lookouts and informers for police activity, actively relocating J.B. to a more concealed area of the hotel to help Plaintiff's Traffickers escape detection of his sex-trafficking activities to guests and law enforcement, and by ignoring Plaintiff's cries for help – these are all actions done by the Harboring Defendant specifically on account of and in awareness of J.B.

130. The venture between Plaintiff's trafficker(s) and Defendant violated the TVPRA with respect to Plaintiff because:

    a. Plaintiff's Traffickers recruited the Plaintiff to participate in commercial sex acts at the Defendant's hotel by, among other reasons, stating that he would take care of the Plaintiff and then using force, coercion, threats and physical violence to force Plaintiff to work as a sex slave;

    b. Plaintiff's Traffickers and Defendant harbored the Plaintiff at Defendant's hotel for the purpose of forcing Plaintiff to engage in commercial sex acts at the property;

c. Plaintiff's Traffickers transported the Plaintiff to the Defendant's hotel for the purpose of Plaintiff participating in commercial sex acts at the hotel;

d. Plaintiff's Traffickers maintained Plaintiff at the Defendant's hotel for the purpose of Plaintiff participating in commercial sex acts at the hotel;

e. The commercial sex acts occurred at the Defendant's hotel in rooms rented by Plaintiff's Traffickers;

f. Plaintiff's Traffickers used force, threats of force, fraud, and coercion to cause Plaintiff to continue to participate in commercial sex acts at the Defendant's hotel including beating the Plaintiff;

g. Plaintiff's Traffickers threatened the Plaintiff with violence against her and her family and used this tactic to cause Plaintiff to engage in commercial sex acts at the Defendant's hotel;

h. Plaintiff's Traffickers de-frauded Plaintiff by falsely telling Plaintiff that they would take care of Plaintiff, and then forcing Plaintiff to work as a sex slave the Defendant's hotel;

i. Plaintiff's Traffickers knowingly, recruited, enticed, harbored, transported, advertised, maintained, and solicited the Plaintiff to engage in commercial sex acts in the Defendant's hotel that Plaintiff's Traffickers rented from Harboring Defendant;

j. Buyers came to the hotel to purchase and purchased the "right" to have sex with Plaintiff from Plaintiff's Traffickers, and then the buyers raped her at the Defendant's hotel;

k. Plaintiff's Traffickers utilized the hotel's wireless internet connection to post advertisements of Plaintiff for the commercial sex acts;

l. Defendant was aware or should have been aware that J.B. was being forcibly trafficked for sex by Plaintiff's Traffickers at the Defendant's hotel but nevertheless continued to rent rooms to Plaintiff's Traffickers for said purpose;

m. Other actions to be proven at trial.

131. The third element of beneficiary liability under the TVPRA is sufficiently pled where the complaint alleges that the plaintiff was sex trafficked in violation of § 1591(a). See *A.D.*

*v. Best W. Int'l, Inc.*, 2023 WL 2955832, at *8 (M.D. Fla. Apr. 14, 2023). Plaintiff J.B. has pled those allegations and satisfied the third element of beneficiary liability under the TVPRA.

### Knowledge that Venture Violated the TVPRA as to the Plaintiff.

132. To sufficiently plead the fourth element, "the defendant must have either actual or constructive knowledge that the venture—in which it voluntarily participated and from which it knowingly benefited—violated the TVPRA as to the plaintiff." *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725. § 1595(a)(2) imposes liability where a defendant "knew or should have known [that the venture] has engaged in an act in violation of this chapter." Id.; see also *Doe #1 v. MG Freesites, LTD*, 676 F. Supp. 3d 1136, 1155 (N.D. Ala. 2022); *Doe v. Hotels*, 2024 WL 2955728, at *5.

133. In this case, Harboring Defendant's owner, managers, employees and agents actively took steps to facilitate Plaintiff's Traffickers' use of the hotel for the forced sex trafficking of J.B. and worked together with Plaintiff's Traffickers to force her to serve their business objectives of keeping the hotel as fully booked as possible. For example, Harboring Defendant's owner, managers, employees and agents acted as police lookouts; relocated Plaintiff's Traffickers and J.B. to quieter rooms to assist Plaintiff's Traffickers with escaping detection by police or other guests; tailored housekeeping services to provide as little disruption to Plaintiff's Traffickers' sex trafficking of J.B. as possible; permitted J.B. and other girls, all remain inappropriately scantily clad, to solicit men for commercial sex in the front desk area of the hotel while employees were present and interacted with J.B. and the other girls; solicited J.B. for sex directly; bartered for forced commercial sex with

J.B. in exchange for a rooms; ignored Plaintiff's marks, cuts, bruises, burns, and injuries; ignored Plaintiff's pleas for help when she tried to escape or requested help to escape; saw Plaintiff and forcibly detained by Plaintiff's Traffickers during her escape attempts and ignored her plight; accepted payoffs from Plaintiff's Traffickers in the form of drugs, money and sex for acting as lookouts; etc.

134. Further, Plaintiff showed obvious signs of illegal and forced sex trafficking, including being injured, beaten, emaciated, and was obviously drugged. Moreover, other girls were at the hotel at the same time, and before her presence at hotel, and were either underage or likewise showed signs of physical abuse similar to those of J.B.

135. The Harboring Defendant knew Plaintiff was being trafficked for sex as Plaintiff would walk around in her "uniform" and solicit customers on premises including in the lobby and near the front desk. The hotel rooms in which Plaintiff was trafficked, including the sheets, carpet and walls, would sometimes be soiled with blood when she and her Traffickers left. A steady flow of adult men — sometimes 15 in one night — would go in and out of Plaintiff's hotel rooms each night she was there. One of those rooms was located close to the lobby where all of this could be seen and frequently heard. J.B. and her Traffickers paid in cash daily even during extended stays and knew the staff intimately given the length of their stay(s) and frequency with which they interacted. Given the facts above, Defendant had actual or constructive knowledge that Plaintiff was being forcibly trafficked for commercial sex.

136. The above facts satisfy the fourth element of a knowing beneficiary claim under the TVPRA as to the Plaintiff. See *W.K. v. Red Roof Inns, Inc.*, 692 F. Supp. 3d 1366, 1371

(N.D. Ga. 2023) (finding sufficient evidence of defendants' knowledge of a TVPRA violation where, *inter alia*, commercial sex at the hotel was "obvious" to employees, hotel employees had commercial sex with a plaintiff, and the defendants had an ongoing relationship with plaintiffs' traffickers); *H.B. v. Red Roof Inns, Inc.*, No. 1:22-cv-1181-JPB, Doc. 158 at 18 (N.D. Ga. June 17, 2024) (finding sufficient evidence as to the fourth TVPRA element where hotel employees provided lookout services and assisted in facilitating the trafficking operation).

137. Actual knowledge requires an awareness or understanding of a fact or circumstance. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th at 725. Whereas constructive knowledge is that knowledge which one using reasonable care or diligence should have. *Id.*

138. Here, Plaintiff specifically alleges that Defendant actually knew and should have known that its enterprise with Plaintiff's Traffickers would violate the TVPRA. Therefore, the knowledge element for beneficiary liability is satisfied as the higher standard has been pled.

139. However, the acts set forth above, at the very least, show that Harboring Defendant had constructive knowledge that Plaintiff would be sex trafficked. General allegations of knowledge are sufficient under the TVPRA to meet the knowledge element under the statute. *C.S. v. Wyndham Hotels & Resorts, Inc.*, 538 F. Supp. 3d 1284, 1297 (M.D. Fla. 2021) (citing *Sun Life Assurance Co. of Can. v. Imperial Premium Fin.*, LLC, 904 F.3d 1197, 1215 (11th Cir. 2018)).

140. Defendant's acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendant had a statutory

obligation not to benefit financially or receive anything of value from a venture that it knew, or should have known, engaged in violating the TVPRA.

WHEREFORE, Plaintiff J.B. demands judgment for damages against Defendant, WEST PALM HOTELS LLC, in an amount in excess of Fifty Thousand Dollars ($50,000.00), costs, interest, attorney's fees, if allowable by law, and such other and further relief as the Court deems just and proper, both in law and in equity. The Plaintiff further demands trial by jury as to all issues triable as a matter of right to a jury.

## COUNT III: PREMISES LIABILITY AGAINST WEST PALM HOTELS LLC

141. Plaintiff, J.B., hereby adopts and re-alleges each and every allegation in paragraphs one through eighty-one above and further states:

142. Super 8 is a public lodging establishment pursuant to Chapter 509 of the Florida Statutes. As "innkeepers" under Chapter 509, the Harboring Defendant had the highest, non-delegable duty of care to Plaintiff, J.B.

143. Aside from its special duty to patrons and guests at the Super 8, Harboring Defendant had a duty to protect its guests from known or anticipated dangers, which includes the dangers of forced sex trafficking.

144. Harboring Defendant, as the owner of the Super 8, owed a duty to Plaintiff to exercise ordinary care in keeping the premises and approaches of the hotel safe.

145. Harboring Defendant's actual and constructive knowledge of criminal activity, including trafficking and drug dealing at the hotel made the repeated raping of Plaintiff foreseeable to the Defendant.

146. Harboring Defendant knew or should have known of steps to take to prevent the hotel

from being used as a venue for sex trafficking, rape, forced drug use, assault, and other crimes perpetrated on Plaintiff but negligently failed to deter the crimes or warn the Plaintiff.

147. Harboring Defendant was negligent and said negligence proximately caused Plaintiff's injuries in the following ways:

    a.  Negligently failing to use ordinary care to keep the premises safe;

    b.  Negligently failing to provide appropriate and effective security personnel during Plaintiff's sex trafficking at the hotel;

    c.  Negligently failing to properly inspect and maintain the premises;

    d.  Negligently failing to properly train and supervise its employees regarding sex trafficking and other sex crimes at the hotel;

    e.  Negligently failing to properly retain, hire, train, and supervise said employees;

    f.  Negligently failing to ensure business policies, systems, and security were adequately followed and implemented;

    g.  Negligently failing to respond to online reviews and publicly available information;

    h.  Negligently failing to prevent loitering, pandering, prostitution and trespassing;

    i.  Negligently failing to remove loiterers, panderers, prostitutes, pimps and trespassers;

    j.  Negligently failing to inspect, patrol, or appropriately monitor the property;

    k.  Negligently failing to provide adequate lighting and employ other available security measures, personnel, and devices, such as controlled access, adequate signage, cameras, patrols, inspections, physical, and other landscaping adjustments, and

other measures available;

l.  Negligently failing to remediate a long history of crime at the hotel;

m.  Negligently failing to warn invitees of known hazards at the property;

n.  Negligently representing to invitees that the property was safe;

o.  Harboring Defendant also had a duty not to aid in the creation of, and not to maintain, a continuous and regularly repeated dangerous criminal condition at the hotel;

p.  Harboring Defendant was aware of the dangerous criminal condition at the hotel and negligently allowed that condition to continue;

q.  Harboring Defendant maintained a dangerous criminal condition at the hotel;

r.  Harboring Defendant's creation of and failure to abate a nuisance caused injury to Plaintiff who was an invited guest of a tenant at the property and therefore an invitee; and

s.  Other negligent acts that violated Florida common law to be proved at trial.

148. At all times material to this Complaint, the Plaintiff, J.B., while an invitee or otherwise lawfully present upon the premises of the Super 8, did sustain injuries as a result of the criminal activity carried out at the Super 8.

149. Harboring Defendant owed a duty to maintain the premises of the Super 8 that it owned, operated, controlled, supervised and/or for which it was otherwise responsible, in a reasonably safe condition and free from conditions that would render it dangerous and unsafe for the Plaintiff, J.B.

150. Harboring Defendant owed a duty to exercise reasonable care to protect the Plaintiff, J.B.,

by inspection or other affirmative acts, from the danger of any reasonably foreseeable harm occurring from the reasonably foreseeable use by sex traffickers of the premises of the Super 8 that it owned, operated, controlled, supervised and/or for which it was otherwise responsible.

151. Harboring Defendant owed a duty to exercise reasonable care to keep the hotel guests of Super 8, including Plaintiff, J.B., safe by implementing and enforcing security measures and other proper protocols.

152. Harboring Defendant owed a duty to safeguard the Plaintiff, J.B., against criminal conduct that it could reasonably foresee happening at Super 8.

153. Harboring Defendant owed a duty to maintain Super 8 in a hospitable, safe and reasonable manner, as well those areas beyond the hotel's property lines for which Defendant had possession, custody or control thereof.

154. Harboring Defendant had actual or constructive knowledge of prior similar sex trafficking incidents involving minors and forcibly against adults that were carried out at Super 8 prior to Plaintiff being forcibly sex trafficked at said property.

155. Harboring Defendant knew or should have known, considering all the attendant circumstances stated herein, that the risk of such criminal conduct taking place at Super 8 would be unreasonably high without Harboring Defendant taking appropriate security precautions or otherwise enforcing those security precautions against such conduct as well as protocols for reporting and refusing such conduct.

156. Harboring Defendant, by and through its owner, managers, employees and agents, had actual knowledge of the dangerous condition the Plaintiff, J.B. was at the Super 8, or in

the alternative, that the dangerous condition existed for a sufficient length of time at the Super 8 such that Harboring Defendant, in the exercise of ordinary care, should have known of the conditions, thereby giving Harboring Defendant constructive knowledge of the Plaintiff J.B.'s peril; and/or that the condition occurred with regularity at the Super 8 and was therefore foreseeable; and/or the Harboring Defendant should have known of the dangerous condition or peril by conducting proper and reasonable inspection of the hotel premises and/or guests' conduct.

157. Because forced sex trafficking and associated conduct was foreseeable, Harboring Defendant had a duty to take adequate measures at the Super 8 to protect their guests, including the Plaintiff, J.B., from being victims of continued forced sex trafficking.

158. At all times material, Harboring Defendant, its owner, managers, employees and agents, created and/or allowed the dangerous condition to exist at the Super 8 and/or failed to keep the Plaintiff, J.B. safe while she was on the premises of the Super 8.

159. Harboring Defendant could have taken any number of corrective measures to make the dangerous conditions at the Super 8 cease as to Plaintiff, including but not limited to, not accepting payments from Traffickers, not allowing "Johns" to enter the Super 8, not allowing sex traffickers to enter the Super 8, providing training regarding human trafficking awareness to employees who perform housekeeping duties, maintenance, or who work at the front desk; providing guidance on how to identify individuals who may be traffickers or their victims of forced sex trafficking; establishing, implementing or enforcing protocols on reporting suspected human trafficking and responding to situations involving human trafficking; and enforcing provisions within employee manuals or

handbook on how to handle general emergency situations or manage criminal risks.

160. In failing to take any measures to report and remove the dangerous condition from the premises of Super 8, Harboring Defendant failed to take reasonable care to protect the Plaintiff, J.B., who was its hotel guest.

161. Furthermore, by leaving the Super 8 premises open and unattended, Harboring Defendant encouraged the use of the hotel premises by loiterers, pimps, criminals, rapists and drug dealers to run their own criminal venture, prostitute, batter, falsely imprison, overdose, enslave, and gravely injure women, including the Plaintiff, J.B., who – because of her fear, mental state, financial restraints and physical injuries from the forced sex occurring in the Super 8 rooms – was unable to rescue herself.

162. Accordingly, Harboring Defendant's failure to act effectively enabled Traffickers to use its hotel rooms to confine and/or imprison the J.B. without any safe means of escape from her sex trafficker.

163. Harboring Defendant, its owner, managers, employees and agents, breached its duties owed to the J.B., and was negligent regarding the safety of the Super 8 by:

    a. Creating a dangerous condition;

    b. Failing to correct the aforementioned dangerous condition;

    c. Failing to report and refuse renting to Traffickers;

    d. Failing to properly and adequately maintain the premises in a reasonably safe condition;

    e. Failing to monitor and prevent its own managers, employees and agents from conducting and engaging in, participating in, and facilitating Traffickers' illegal

sex trafficking of J.B. by acting as lookouts, informants, and by relocating Traffickers to areas of the hotel that would escape detection by law enforcement of his sex trafficking activities;

f.   Failing to have security measures to protect the Plaintiff;

g.   Failing to provide training regarding human trafficking awareness to employees who perform housekeeping duties, maintenance, or who work at the front desk;

h.   Failing to provide guidance to employees on how to identify individuals who may be traffickers or victims of sex trafficking;

i.   Failing to establish, implement or enforce protocols on reporting suspected human trafficking and responding to situations involving human trafficking;

j.   Failing to enforce provisions within employee manuals or handbooks on how to handle general emergency situations or manage criminal risks; and

k.   Failing to take affirmative steps to investigate suspicious conduct and forbid criminal conduct.

164. Harboring Defendant could have and should have posted anti-sex trafficking awareness and informational materials in common areas and guest rooms at the hotel to help eliminate sex trafficking, but they did not.

165. J.B.'s injuries and consequential damages were the direct and proximate result of the Harboring Defendant's acts and omissions, namely:

a.   Failure to provide training regarding forced sex trafficking awareness to employees who perform housekeeping duties, maintenance, or who work at the front desk;

b.   Failure to provide guidance on how to identify individuals who may be traffickers

or victims of forced sex trafficking;

c.  Failure to establish, implement or enforce a protocol on reporting suspected forced sex trafficking;

d.  Failure to establish, implement or enforce a protocol to respond to situations involving forced sex trafficking;

e.  Failure to enforce provisions within employee manuals or handbooks on how to handle general emergency situations or manage criminal risks regarding forced sex trafficking;

f.  Failure to require their agents, servants, franchisees and/or employees to participate, complete and continue education regarding forced sex trafficking at the Super 8;

g.  Failure to remove and/or refuse subsequent accommodations to the Plaintiff's Traffickers when conduct displayed on the premises included a combination of physical violence towards J.B., intoxication, profanity, lewdness, brawling, disturbing the peace or comfort of other guests, illegal activity, disorderly conduct and drug dealing;

h.  Allowing rental of hotel rooms without conferring with senior management notwithstanding the suspicions;

i.  Failure to correct or remedy protocols that were defective or ineffective in preventing or handling prior forced sex trafficking incidents at the Super 8;

j.  Failure to provide adequate security personnel at the Super 8 to protect their guests;

k.  Failure to establish, implement and enforce appropriate security policies and

procedures for certain times of day, room locations, and suspicious activity;

l.  Permitting unknown persons to loiter, to gain entry to guest rooms, to know room numbers, and to have access to room keys;

m.  Failure to check the background of the hotel employees for sex crimes and other unlawful acts; and

n.  Otherwise failing to use reasonable care for the safety of their guests, including J.B.

166. By failing to act, the Harboring Defendant, by and through their actual or apparent agents, servants, franchisees and/or employees, allowed J.B. to be imprisoned, raped, and confined for forced sexual trafficking while collecting rental fees thereon.

167. As a direct and proximate result of the acts and omissions of the Harboring Defendant by and through their agents, servants, franchisees and/or employees – which led to the continuous dangerous condition at the Super 8 during the time period within which J.B. was trafficked  there, J.B. has suffered bodily injuries that are of a continuing or permanent nature, resulting pain and suffering, disability, disfigurement, mental anguish, PTSD, humiliation, distress, deformation, loss of capacity to enjoy life, loss of enjoyment of life, and expenses of medical treatment. All of the losses are either permanent or continuing in their nature and the Plaintiff will suffer from such losses in the future.

WHEREFORE, Plaintiff, J.B., demands judgment for damages against the Defendant, WEST PALM HOTELS LLC, in an amount in excess of Fifty Thousand Dollars ($50,000.00), costs, interest, attorneys' fees, if allowable by law, and such other and further relief as the Court deems just and proper, both in law and in equity. The Plaintiff further demands trial by jury as to all issues triable as a matter of right to a jury.

## COUNT IV - NEGLIGENT HIRING, SUPERVISION AND RETENTION AGAINST WEST PALM HOTELS LLC

168. Plaintiff, J.B., hereby adopts and re-alleges each and every allegation in paragraphs one through eighty-one above and further states:

169. Plaintiff J.B. brings this claim against Defendant, WEST PALM HOTELS LLC, for negligent hiring, supervision and retention.

170. Super 8 is a public lodging establishment pursuant to Chapter 509 of the Florida Statutes. As "innkeepers" under Chapter 509, the Super 8 Defendant had the highest, non-delegable duty of care to Plaintiff, J.B.

171. Aside from their special duty to patrons and guests at Super 8, including Plaintiff, J.B., the Harboring Defendant had a duty to protect their guests from known or anticipated dangers, which includes the dangers of forced sex trafficking.

172. "To state a claim under Florida law for negligent hiring, supervision and/or retention, a plaintiff must establish that the employer owed a legal duty to the plaintiff to exercise reasonable care in hiring and retaining safe and competent employees." *Clary v. Armor Corr. Health Servs., Inc.*, 2014 WL 505126, *4 (M.D. Fla. Feb. 7, 2014) (citations omitted). "Florida law also holds employers liable for reasonably foreseeable damages resulting from the negligent training of its employees and agents." *Id.* (citing *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1265 (11th Cir. 2001)). "For an employer to owe a plaintiff a duty, the plaintiff must be in the zone of risk that was reasonably foreseeable to the employer." *Id.* (citation omitted).

173. Harboring Defendant, its owner, managers, employees and agents, negligently

authorized criminals to rent rooms for illegal sex trafficking at Super 8, creating a foreseeable risk that the J.B. would be sold, used, abused, drugged, beaten and forced to engage in conduct for fear of her life.

174. Harboring Defendant, its owner, managers, employees and agents, failed to either identify and/or report the human sex trafficking and foreseeable harm of the Plaintiff.

175. Harboring Defendant, its owner, managers, employees and agents, failed to refuse continued lodging services to human sex traffickers.

176. Harboring Defendant was in control of the hiring of managers, employees, and/or agents at the Super 8 that it owned, operated, supervised, controlled and/or or was otherwise responsible for, and was responsible for performing background checks on these managers, employees and/or agents; instructing, training and supervising said managers, employees and/or agents; and deciding whether to terminate said managers, employees and/or agents.

177. Harboring Defendant had a duty to make an appropriate investigation of their managers, employees and/or agents.

178. Harboring Defendant was in control of the supervising of the managers, employees and/or agents at the hotels that they owned, operated, supervised, controlled and/or or were otherwise responsible, and was responsible for instructing, training and supervising said managers, employees and/or agents.

179. Harboring Defendant knew or should have known that its managers, employees and/or agents were allowing criminals to rent rooms for prostitution and drug dealing.

180. Harboring Defendant knew or should have known that its managers, employees and/or

agents were failing to either identify and/or report the human sex trafficking and foreseeable harm of the Plaintiff and others.

181. Harboring Defendant knew or should have known that its managers, employees and/or agents were failing to refuse continued lodging services to human sex traffickers.

182. At all material times, Harboring Defendant was negligent in its hiring, employment, supervision and termination decisions regarding their managers, employees and/or agents, and said negligent decisions caused the J.B. to be injured.

183. It was foreseeable that Harboring Defendant's acts and omissions increased the risk that these illegal acts would regularly occur on the premises of the Super 8 and would cause harm to the J.B.

184. But for the negligence and omissions of Harboring Defendant as to safety at the Super 8, the criminal conduct, including human sex trafficking, on the foregoing dates could have been prevented and/or stopped.

185. Accordingly, Harboring Defendant is liable for all harmful results that are the normal incidents of, and within the increased risk caused by, its negligent acts and omissions regarding the Super 8.

186. As a direct and proximate result of the acts and omissions of Harboring Defendant, by and through its managers, employees and/or agents – which led to the continuous sex trafficking of J.B. for approximately 4 years, as described above – Plaintiff J.B. has suffered bodily injuries that are of a continuing or permanent nature, resulting pain and suffering, disability, disfigurement, mental anguish, PTSD, humiliation, distress, deformation, loss of capacity to enjoy life, loss of enjoyment of life, and expenses of

medical treatment. All the losses are either permanent or continuing in their nature and the Plaintiff will suffer from such losses in the future.

WHEREFORE, Plaintiff J.B. demands judgment for damages against the Defendant, WEST PALM HOTELS LLC, in an amount in excess of Fifty Thousand Dollars ($50,000.00), costs, interest, attorneys' fees, if allowable by law, and such other and further relief as the Court deems just and proper, both in law and in equity. The Plaintiff further demands trial by jury as to all issues triable as a matter of right to a jury.

### CAUSATION AND DAMAGES

187. Plaintiff J.B. was harbored at Defendant's hotel where she was seriously and permanently injured as a direct result of the Harboring Defendant's acts and omissions, in that the Harboring Defendant knowingly permitted, harbored and facilitated illegal sex trafficking ventures to take place at the Defendant's hotel whereby the Plaintiff J.B. was routinely and continuously abused, battered, falsely imprisoned, raped, beaten, starved, forcibly injected with drugs and enslaved.

188. Under the TVPRA, Harboring Defendants are jointly and severally liable for all damages a jury awards to J.B. for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

189. More specifically, at all material times, in the quest for profits, the acts and omissions of the Harboring Defendant caused the Plaintiff to suffer:

    n. Forced labor;

    o. Forced confinement without safe means of escape;

    p. Assault and fear;

### ▪ VICTIM'S VOICE, LLC ▪
**100 N. Federal Hwy, 4ᵗʰ Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700**

q.  Sickness, dizziness and headaches;

r.  Cuts, lacerations, abrasions and other physical harm;

s.  Mental anguish, humiliation, exploitation, degradation and mental distress;

t.  Suffocation, battery, sexual assault and rape;

u.  Shock, fright and post-traumatic stress;

v.  Overdose and drug-induced dangers;

w.  Forced (sexual) slavery; and

x.  Invasion of privacy.

190. As a direct and proximate result of Defendant's acts and omissions Plaintiff suffered substantial physical, emotional, and psychological harm and other damages.

191. Defendant is jointly and severally liable with Plaintiff's Traffickers and any other non-party actors who participated in the trafficking for the indivisible injuries that the venture proximately caused to Plaintiff.

192. Plaintiff brings each and every claim for damages permissible under the law against the Harboring Defendant, who are jointly and severally liable, for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, and all compensatory, special, actual, general, and consequential damages permissible under the law, including, but not limited to the following actual past, present and future damages:

a.  Personal injuries;

b.  Past, present and future pain and suffering;

c.  Disability;

    d.  Disfigurement;

    e.  Mental anguish;

    f.  Loss of the capacity for the enjoyment of life;

    g.  Loss of earning capacity;

    h.  Lost wages;

    i.  Direct damages;

    j.  Incidental and consequential damages;

    k.  Emotional distress damages;

    l.  Necessary medical expenses;

    m.  Life care expenses;

    n.  Physical pain and suffering;

    o.  Physical impairment;

    p.  Attorneys' fees as allowed by law;

    q.  Costs of this action; and

    r.  Pre-judgment and all other interest recoverable as a matter of law;

193. The injuries and harms that Plaintiff J.B. suffered as a result of the Harboring Defendant's negligent operation of the Defendant's hotel and failure to make the hotel premises safe are of a permanent and/or continuing nature.

194. Each of the forgoing acts and omissions constitute an independent act of negligence on the part of the Defendant, and one or more or all of the above stated acts were the proximate causes of the injuries and damages sustained by the Plaintiff.

**▪ VICTIM'S VOICE, LLC ▪**
100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700

## JURY DEMAND

195. Plaintiff, J.B., requests trial by jury.

WHEREFORE, Plaintiffs pray for a judgment against the Defendant and for the following:

1) That process and summons issue requiring Defendant to appear as provided by law to answer the allegations of the Complaint;

2) Plaintiff be awarded actual damages in amounts to be shown at trial;

3) Plaintiff be awarded all general, special, compensatory, economic, and other allowable damages in accordance with the enlightened conscience of an impartial jury from Defendant;

4) Plaintiff be awarded her attorneys' fees and case expenses as allowed by law;

5) Plaintiff be provided with a trial by jury; and

6) Plaintiff have such other further legal and equitable relief as this Court deems just and appropriate under the circumstances.

DATED this 26th day of August, 2025.

> Victim's Voice, LLC
> **Attorneys for Plaintiff**
> 100 N. Federal Hwy, 4th Floor
> Fort Lauderdale, FL 33301
> Telephone: 754.335.4700
> Facsimile: 954.994.0040
> Primary email: anthony@victimsvoice.law
> Secondary email: vv.001@victimsvoice.law
>
> By: /s/: *Anthony Chiarello*
> Anthony Chiarello, Esq.
> Florida Bar No.: 73760

### ▪ VICTIM'S VOICE, LLC ▪
100 N. Federal Hwy, 4th Floor, Fort Lauderdale, FL 33301 ▪ Phone: 754-335-4700